☒ FILED  ☐ LODGED

**JAN 20 2023**

CLERK U.S. DISTRICT COURT
DISTRICT OF ARIZONA

Kahliel T. Brown #327850
Name and Prisoner/Booking Number

ASPC Eyman Complex/Meadows Unit
Place of Confinement

P.O. Box 3300
Mailing Address

Florence, Arizona 85132
City, State, Zip Code

(Failure to notify the Court of your change of address may result in dismissal of this action.)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

Kahliel T. Brown,
(Full Name of Plaintiff)

Plaintiff,

v.

(1) (unknown) Rappaport,
(Full Name of Defendant)

(2) (unknown) Hodgkins,

(3) (unknown) Romero,

(4) _____,

Defendant(s).

☐ Check if there are additional Defendants and attach page 1-A listing them.

CASE NO. CV-23-138-PHX-DWL (JFM)
(To be supplied by the Clerk)

**CIVIL RIGHTS COMPLAINT
BY A PRISONER**

☒ Original Complaint
☐ First Amended Complaint
☐ Second Amended Complaint

Jury Trial Demand

### A. JURISDICTION

1. This Court has jurisdiction over this action pursuant to:
   ☒ 28 U.S.C. § 1343(a); 42 U.S.C. § 1983
   ☐ 28 U.S.C. § 1331; *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971).
   ☐ Other: _____.

2. Institution/city where violation occurred: ASPC Eyman Complex/Meadows Unit, Florence

Revised 3/11/16                      1                                   **550/555**

## B. DEFENDANTS

1. Name of first Defendant: (unknown) Rappaport. The first Defendant is employed as: Correctional Officer II (Position and Title) at ASPC Eyman Complex/Meadows Unit (Institution)

2. Name of second Defendant: (unknown) Hodgkins. The second Defendant is employed as: Correctional Officer II (Position and Title) at ASPC Eyman Complex/Meadows Unit (Institution)

3. Name of third Defendant: (unknown) Romero. The third Defendant is employed as: SSU Lieutenant (Position and Title) at ASPC Eyman Complex/Meadows Unit (Institution)

4. Name of fourth Defendant: _____. The fourth Defendant is employed as: _____ at _____ (Position and Title) (Institution)

If you name more than four Defendants, answer the questions listed above for each additional Defendant on a separate page.

## C. PREVIOUS LAWSUITS

1. Have you filed any other lawsuits while you were a prisoner?     ☐ Yes    ☒ No

2. If yes, how many lawsuits have you filed? _____. Describe the previous lawsuits:

   a. First prior lawsuit:
      1. Parties: _____ v. _____
      2. Court and case number: _____
      3. Result: (Was the case dismissed? Was it appealed? Is it still pending?) _____

   b. Second prior lawsuit:
      1. Parties: _____ v. _____
      2. Court and case number: _____
      3. Result: (Was the case dismissed? Was it appealed? Is it still pending?) _____

   c. Third prior lawsuit:
      1. Parties: _____ v. _____
      2. Court and case number: _____
      3. Result: (Was the case dismissed? Was it appealed? Is it still pending?) _____

If you filed more than three lawsuits, answer the questions listed above for each additional lawsuit on a separate page.

2

### D. CAUSE OF ACTION

#### COUNT I

1. State the constitutional or other federal civil right that was violated: <u>Eighth Amendment,</u> <u>Cruel and Unusual Punishment</u>.

2. **Count I.** Identify the issue involved. Check **only one**. State additional issues in separate counts.
   ☐ Basic necessities    ☐ Mail    ☐ Access to the court    ☐ Medical care
   ☐ Disciplinary proceedings    ☐ Property    ☐ Exercise of religion    ☐ Retaliation
   ☒ Excessive force by an officer    ☐ Threat to safety    ☐ Other: _____

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Count I. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

   1.) Tuesday, January 10, 2023, approximately 1230pm I was leaving classroom #1 after my teacher gave me permission to leave early. COII Rappaport approached me yelling, "Hey, Hey!" When he got to me he asked if I was going to class. I told him, "My teacher excused me from class so I'm going to my housing unit." COII Rappaport waved his hand to signal me to continue to my housing unit.
   2.) As I continued to my housing unit COII Rappaport yelled, "Hey, come back!" I returned to him. When I arrived to where he was standing COII Rappaport told me tuck my shirt in. I tucked my shirt in.
   3.) COII Rappaport said, "Now go back to your fucking housing unit!"
   4.) I said, "OK I am."
   5.) Before I could turn around COII Rappaport said, "You don't need to say a fucking thing, nigger. Just go back to your fucking house." I am a Black man. COII Rappaport is white. I immediately was offended by his words.
   6.) I told COII Rappaport, "You don't have to talk to me like that. I'm...

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).
   33.) The actions of Defendant Rappaport in using physical force against me was without need or provocation, was done maliciously and sadistically and constituted cruel and unusual punishment in violation of the Eighth...

5. **Administrative Remedies:**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution?    ☒ Yes    ☐ No
   b. Did you submit a request for administrative relief on Count I?    ☐ Yes    ☒ No
   c. Did you appeal your request for relief on Count I to the highest level?    ☐ Yes    ☒ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. <u>Because I was threatened with retaliation if I did.</u>

3

D.) CAUSE OF ACTION, Supporting Facts   Count I        3A

... going." Even though I was deeply offended by his words I was still speaking to him calmly and non-aggressively.

7.) CO II Rappaport ordered me to give him my ID, so I did. As I handed it to him he pulled his hand back and dropped it on the ground and said, "You did that on purpose. Pick it up, nigger!"

8.) I said, "Just leave me alone. I'm going back to my housing unit." As I walked away CO II Rappaport continued to curse at me and use racial epithets.

9.) At that time CO II Hodgkins and told me not to walk away from CO II Rappaport while CO II Rappaport was talking to me, so I turned around as CO II Hodgkins escorted me back to where CO II Rappaport was standing.

10.) When I arrived back to where CO II Rappaport was standing CO II Rappaport said, "Oh, you can't follow directions? Cuff up, then."

11.) I raised my open hands to shoulder height to demonstrate that I was not a threat.

12.) CO II Rappaport grabbed me and yanked me around, then handcuffed me. CO II Rappaport squeezed the handcuffs closed so tight as to purposefully cause me pain. I told CO II Rappaport that I was in pain from the handcuffs and he told me to "shut the fuck up!" Then he began twisting the handcuffs upward a few times to emphasize his point. This caused the handcuffs to dig even deeper into my wrists to cause me more pain. Then CO II Rappaport and CO II Hodgkins escorted me across the yard, one on each side, hands on my elbows. It was humiliating.

13.) As we walked across the yard other officers approached to ask why I was in handcuffs when no Incident Command System (ICS)...

3-B

...had been initiated over the radios. By information and belief, it is ADCRR policy that ICS be activated by radio with an officer designated to bring and operate a video recorder whenever there was a use of force incident. By information and belief, this includes whenever a prisoner is physically restrained by officers in any way.

14.) COII Rappaport repeatedly told the officers who approached and inquired of the break in protocol that he was going to "teach this punk-ass kid a lesson." COII Hodgkins laughed every time COII Rappaport said this.

15.) It was at this point that I began to fear for my life due to COII Rappaport's comments and the fact that I have a congenital heart condition in which my heart can stop and kill me if I am struck in the chest. I told COII Rappaport, "I have a heart condition that could kill me. I'm not resisting or anything." COII Rappaport said, "You should have thought of that before you decided not to follow directions." COII Hodgkins said nothing.

16.) Everything up to this point was captured by the yard cameras, as was later confirmed to me by Lieutenant Romero.

17.) We passed through the gate that led to the back lot area, behind the kitchen, where there are no cameras.

18.) As we were walking behind the buildings, COII Rappaport suddenly slammed my head against the wall for no reason. As he slammed my head against the wall an unknown Lieutenant walked by. COII Rappaport told the Lieutenant, "I'm just teaching this punk-ass kid a lesson." COII Hodgkins said nothing.

19.) Then COII Rappaport slammed my head against the wall again, this time hard enough that I saw "stars" behind my eyes and felt weak at the knees. I started to get dizzy. COII Rappaport told me, "If you turn around or talk I'll stomp you out and leave you to die." I took that as

3-C

a legitimate threat to my life because of my known heart defect and my small size (I am 5'5", 112 pounds). CO II Hodgkins cheered CO II Rappaport on as he said this. Then CO II Rappaport continued on and said, "You're lucky you're a little-ass guy or I'd slam you down and snap your neck. I hate all you niggers. I keep having problems with all of you but you'll learn." CO II Hodgkins chuckled and said, "He'd do it, too."

20.) Then we walked through a door and CO II Rappaport pushed me roughly into a chair and left. CO II Hodgkins stood guard over me while CO II Rappaport was gone.

21.) After some time CO II Rappaport returned and told me, "Shut up about this and don't go crying to your people or next time it'll be worse." I took that as a threat not to tell the other African-Americans at this unit or to use the grievance process or else I'd face physical consequences. After seeing that I had no reaction to this threat, CO II Rappaport told CO II Hodgkins to uncuff and told me to return to my housing unit.

22.) By this time the tightened handcuffs had been around my wrists for so long and were so tight that my hands were swollen and painful to the touch when CO II Hodgkins removed the handcuffs.

23.) I returned to my housing unit feeling dizzy, nauseous, and frightened for my safety.

24.) Up to this point there was still no activation of Incident Command System (ICS) which required the use of video recording whenever a prisoner is handcuffed for disciplinary reasons or force is used according to ADCRR policy, nor was I issued any disciplinary infractions at this time.

25.) At my housing unit I laid on my bed hoping the dizziness

3-D

... nausea, and pain in my wrists and hands would go away, but they only continued. The worst was the dizziness and nausea, and when another prisoner told me I had a visible bump on my head, I decided to ask for medical treatment.

26.) A medical ICS was initiated. Somehow, COII Hodgkins, who wasn't even working in my housing unit, was the officer who initiated it. Him being in the building left me uncomfortable and with questions. Somehow, also, a video recorder was once again not brought. Upon information and belief, it is ADCRR policy that all medical ICS's be video recorded.

27.) Medical personnel arrived, as did COII Heim, Sgt. Sotello, COII Core, and a female sergeant. They questioned me about why I was dizzy and nauseous but I was afraid to tell them with COII Hodgkins present.

28.) It wasn't until I was in the medical unit surrounded by medical personnel that I felt comfortable enough to report to the medical personnel that a correctional officer had slammed my head into a wall and that was why I felt dizzy and nauseous. This was verbally reported to the medical personnel in the presence of the same female sergeant who responded to the ICS and COII Heim. By information and belief the female sergeant and COII Heim did not write reports of this discussion. I was told verbally that I would have a follow appointment.

29.) By information and belief, no Incident Reports or Use of Force reports were written until after I sought medical treatment.

30.) At no time during these events did I behave in any way that could have been interpreted as a physical threat to the safety of these white officers. I answered all questions calmly and immediately...

3-E

...as was later confirmed by Lt. Romero after he viewed the yard video of the original event that led to me being restrained in handcuffs. When told to "cuff up" I raised my open hands to shoulder height to show that they were empty and that I had no intent to resist. I obeyed all commands, even when COII Hodgkin's commands contradicted COII Rappaport's. The use of force was unnecessary and unprovoked. The language of these white officers demonstrated malicious and sadistic intent, as did their failure to follow Use of Force protocols and ADCRR policy until after I sought medical treatment and reported these two white officers' conduct to medical personnel and the officers were caught "red-handed". COII Rappaport's repeated comments to other white officers that he was going to "teach me a lesson" supports prior planning and malicious and sadistic intent, as did the racial slurs he repeatedly called me. COII Rappaport's actions of repeatedly slamming my head into the wall with enough force to cause me to see stars and my knees to buckle was excessive force and not necessary to restore discipline for the violation of my shirt being untucked, nor were the repeated racial slurs I was subjected to.

31.) Having observed that at 5'5", 112 pounds, and having been informed of my congenital heart defect, COII Hodgkins' standing by and not only not intervening in this illegal beating but also cheering on COII Rappaport's illegal actions show malicious and sadistic intent, and deliberate indifference to my safety, life, and well-being.

32.) Because of the threats of retaliation by these two white officers if I told anyone I have not used the institution grievance remedies beyond verbally reporting the actions of the officers due to the

3-F

...events described later in Count II.

Count I *4 Injury.

...Amendment of the United States Constitution.

34.) The actions of Defendant Hodgkins in failing to intervene to prevent the misuse of force was done maliciously and sadistically and constituted cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution.

35.) The actions of Defendant Rappaport in using physical force against me without need or provocation constituted the tort of assault and battery under the law of Arizona.

36.) The actions of Defendant Hodgkins in failing to take action to curb the physical abuse of me by Defendant Rappaport constituted deliberate indifference to my safety and contributed to and proximately caused the above-mentioned violation of my Eighth Amendment rights and assault and battery.

37.) Due to the actions of Defendant Rappaport I now suffer from sudden onset migraines, ringing in my ears, lingering pain and numbness in my hands and blurry vision in one eye.

38.) Due to the actions of both Defendant Rappaport and Hodgkins I have been experiencing recurring nightmares followed by panic attacks, general anxiety and rapid fluctuating mood swings.

## COUNT II

1. State the constitutional or other federal civil right that was violated: <u>First Amendment;</u>
<u>Eighth Amendment</u>

2. **Count II.** Identify the issue involved. Check **only one**. State additional issues in separate counts.
   - ☐ Basic necessities
   - ☐ Mail
   - ☐ Access to the court
   - ☐ Medical care
   - ☐ Disciplinary proceedings
   - ☐ Property
   - ☐ Exercise of religion
   - ☒ Retaliation
   - ☐ Excessive force by an officer
   - ☐ Threat to safety
   - ☐ Other: _____

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Count II. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments. Paragraphs 1-38 incorporated by reference as though stated herein:
39.) After seeking medical care and reporting my physical and mental abuses I was released by medical to return to my housing unit.
40.) Approximately 3:45 pm COII Core came to tell me to go to the captain's area, a secluded area without cameras, not far from where COII Rappaport bashed my head into the wall. I was in fear for my life. I thought I was going to have to endure a repeat of what had happened earlier because I had reported the assault to medical personnel even though COII Rappaport had threatened me not to. I asked for another prisoner who was much bigger than me to go with me as a witness, but when COII Core called (by information and belief, SSU Lieutenant Romero), permission was denied.
41.) When I arrived to the captain's area the seclusion really set in. There were no other people in sight. The entire yard was empty of people. I was led into the "captain's area" and the gate was padlocked behind me. Then I was led into the SSU office. Inside that room was a videocamera, Lt. Romero, Sgt. Sotello and SSU COII Baldenegro. Lt. Romero conducted the

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).
48.) The actions of Lt. Romero when he threatened to move me to a higher custody unit if I continued to complain about having been assaulted by COII Rappaport were retaliatory in n.

5. **Administrative Remedies.**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution?  ☒ Yes  ☐ No
   b. Did you submit a request for administrative relief on Count II?  ☐ Yes  ☒ No
   c. Did you appeal your request for relief on Count II to the highest level?  ☐ Yes  ☒ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. <u>Because I was threatened with retaliation if I did.</u>

4

D.) CAUSE OF ACTION, Supporting Facts   Count II          4-A

... meeting. It was a small room. I was told to sit down. They hovered over me. I felt very intimidated and alone.

42.) Lt. Romero began the meeting by discussing my past disciplinary behavior. I've only had one previous disciplinary action but he continued to portray me as a troublemaker.

43.) Lt. Romero then began discussing how issues like this "can get out of control" as prisoners find out that yet another prisoner was assaulted by officers here at Meadows. He intimated that this event would be better off not going any further. My understanding was that the event was not to be told to anyone outside of that room. It was basically a repeat performance of COII Rappaport telling me earlier not to tell "my people."

44.) Lt. Romero then told me that if any issues arose I would be moved to another prison. Based on the previous attempt to make me seem like a troublemaker I got the impression that the move would be to a higher custody unit. He asked me if I had any issues to report. I said "no" because I didn't want to be moved to higher custody. He then smirked and asked, "Do you feel safe?" I knew it was a trick but I didn't want to be transferred so I said, "Yes." He then pointed to a piece of paper that had been sitting on a desk all along, apparently pre-filled out. It was a paper that said I felt "safe". He told me to sign it if I didn't want to be transferred. I felt coerced, but I signed it.

45.) Sgt. Sotello walked me out of the office. He asked me if I was going to medical again. I told him I was supposed to have a follow-up the next day. He told me to wait there. Then Sgt. Sotello walked over to the medical

4-B

... unit and went inside. Ten minutes later he returned from the medical unit and told me not to "worry about medical." I didn't know what he meant by this so I kept quiet and returned to my housing unit.

46.) Per policy, I was supposed to be required to have a follow-up medical appointment after a Medical ICS was activated. By information and belief, that follow-up appointment is to be within 24 hours of the ICS event. Almost a week later I still haven't had that follow-up appointment even though my symptoms continue to worsen. It is my opinion and belief that when Sgt. Sotello spent ten minutes in medical that Tuesday, he was instructing medical staff not to follow up with me, and that was what he meant when he told me not to "worry about medical."

47.) Count II is a retaliation claim. The retaliation was the threat of transfer to a higher custody unit if I told anyone about the assault, which encompasses using the grievance process. Using the grievance process to report that COII Rappaport assaulted me is a protected and valid conduct. The threat of further retaliation was in response to my having engaged in another protected and valid conduct, seeking medical attention for the symptoms I was enduring after the assault. But for seeking medical attention for the assault I would not have been threatened with further, various forms of retaliation. The assault combined with the threat of further retaliation were sufficiently

4-C

serious to deter me from using the grievance process any further. Part of the grievance process is the informal reporting of the issue being grieved. I did this and received threats if I continued further. Thus, I exhausted all available options and no further options were available without subjecting myself to further harm. The threat of harm has been held by many courts sufficiently adverse to support a retaliation claim. The chronology of events clearly infers an intent to prevent me from using the grievance process regarding this assault. But for the threat of more retaliation I would have continued seeking redress through the grievance system.

Count II #4 Injury

...nature and the direct result of having engaged in constitutionally protected conduct, i.e. seeking medical attention and complaining about the assault through proper channels, and deterred me from further use of the prison grievance system and left me in fear of retaliation if I seek additional medical attention without legitimate penological need or interest and constituted a violation of my First and Eighth Amendment rights provided by the Constitution of the United States.

49.) The actions of Lt. Romero in coercing me to sign a paper that would be used to refute any grievance process I chose to use in the future were intimidatory in nature and clearly threatened a course of further retaliation if I did not sign that paper had no legitimate penological interest or need and thus ...

4-D

...violated my First and Eighth Amendment rights under the United States constitution.

50) The actions of Lt. Romero in threatening to send me to a higher custody unit has resulted in great mental and emotional anguish and anxiety, causing me to fear further consequences for complaining about having been assaulted by COII Rappaport. I now suffer panic attacks and uncontrollable mood swings that I did not suffer prior to the actions of Lt. Romero. In addition I feel helpless and hopeless because I was forced to choose between grieving the aforementioned actions and being transferred to a more dangerous unit.

## E. REQUEST FOR RELIEF

State the relief you are seeking:

A) Issue a declatory judgment stating that:
1.) The physical abuse of the Plaintiff by Defendant Rappaport violated Plaintiff's rights under the Eighth Amendment to the United States Constitution and constituted an assault and battery under state law.
2.) Defendant Hodgkins' failure to take action to curb the physical abuse of Plaintiff violated Plaintiff's rights under...

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 20, 2023
DATE

Kahliel T. Brown
SIGNATURE OF PLAINTIFF

_____
(Name and title of paralegal, legal assistant, or other person who helped prepare this complaint)

_____
(Signature of attorney, if any)

_____
(Attorney's address & telephone number)

## ADDITIONAL PAGES

All questions must be answered concisely in the proper space on the form. If you need more space, you may attach no more than fifteen additional pages. But the form must be completely filled in to the extent applicable. If you attach additional pages, be sure to identify which section of the complaint is being continued and number all pages.

E.) Request for Relief                                          6-A

... the Eighth Amendment to the Constitution of the United States and constituted an assault and battery under state law.

3.) Defendant Romero's actions in issuing threats for Plaintiff's use of the grievance system and threats against further use of the grievance system were retaliatory and intimidatory in nature and violated Plaintiff's rights under the First and Eighth Amendments to the United States Constitution.

B.) Award compensatory damages jointly and severally against Defendants Rappaport and Hodgkins for the physical and emotional injuries sustained as a result of Plaintiff's beating in amounts directed by the Court.

C.) Award compensatory damages against Defendant Romero for the physical and emotional injuries resulting from the threats issued against the Plaintiff in amounts directed by the Court.

D.) Award punitive damages jointly and severally against each Defendant in amounts directed by the Court.

E.) Grant any other equitable and just relief deemed necessary by the Court.